# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 84

### APRIL TERM, A.D. 2021

### July 22, 2021

LLOYD JAMES THOMPSON, JR.,

Appellant
(Defendant),

v.

S-20-0206

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
The Honorable Kerri M. Johnson, Judge

*Representing Appellant:*

Office of the State Public Defender:  Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Francis H. McVay, Senior Assistant Appellate Counsel.  Argument by Mr. McVay.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Kellsie J. Singleton, Senior Assistant Attorney General.  Argument by Ms. Singleton.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\* Chief Justice at time of oral argument.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KAUTZ, J.**

[¶1]   A jury convicted Lloyd James Thompson of two counts of aggravated assault and battery.  He appeals from his convictions, arguing the district court abused its discretion in allowing the hearsay testimony of two law enforcement officers at trial.  We conclude the court abused its discretion in admitting the testimony, but Mr. Thompson was not prejudiced.  We affirm.

## ISSUE

[¶2]   Mr. Thompson raises one issue for our review:

Did the district court abuse its discretion in allowing, over his objection, the hearsay testimony of two law enforcement officers at trial?

## FACTS

[¶3]   In the early evening hours of June 30, 2019, Kristine Booth-Thompson returned home after attending her niece's bridal shower in Colorado.  She did not have her house keys, so she called her husband, Mr. Thompson, to let her in.  Mr. Thompson arrived five minutes later, and they entered the home.  Ms. Booth-Thompson went to the kitchen to make herself a late lunch, while Mr. Thompson retreated to the bedroom to watch a movie.  A short time later, Mr. Thompson, who was intoxicated, accused Ms. Booth-Thompson of having an affair and called her vulgar names.  Ms. Booth-Thompson grabbed her insulin bag and left the house on foot, planning to walk to her sister's house.  Mr. Thompson followed her in the couple's Jeep.

[¶4]   As Ms. Booth-Thompson was walking down the right-hand side of the road, Mr. Thompson drove up quickly behind her and hit her left arm with the Jeep's passenger side mirror.  Ms. Booth-Thompson continued walking.  Mr. Thompson tried to cut her off by driving on the right shoulder of the road approaching her right side.  In doing so, he almost ran over her right ankle.  Ms. Booth-Thompson crossed the road and continued walking.  Mr. Thompson followed her, demanded she get in the Jeep and come back to the house with him, and said if she did not, "he'd put a couple rounds in [her]."  Ms. Booth-Thompson did not get in the Jeep "because [she] was afraid [of] what would happen if [she] did."  Mr. Thompson pulled out a gun and pointed it at her.  Ms. Booth-Thompson turned away and heard the gun go off behind her.

[¶5]   A neighbor and her daughter witnessed the events and called 911.  The daughter told the 911 dispatcher a man was following a woman in a Jeep, was "running the Jeep onto her" and trying to run her over, and had fired a handgun at a neighbor's fence.  Law enforcement officers arrived shortly thereafter and arrested Mr. Thompson.  They searched the Jeep and found a loaded handgun tucked between the front passenger seat and the center

1

console. They also found a shell casing on the road; the casing matched the bullets found in the handgun.

[¶6]   Sergeant Sean Ellis of the Natrona County Sheriff's Office interviewed Mr. Thompson after the incident. Mr. Thompson admitted he accused Ms. Booth-Thompson of having an affair; she left the house and he followed her in the Jeep; he drove next to her; and there was a gun in the Jeep. He claimed, however, "he would approach her [in the Jeep] so he could hear her." He denied holding the gun, pointing it at Ms. Booth-Thompson, or firing it.

[¶7]   The State charged Mr. Thompson with three counts of aggravated assault and battery. Counts 1 and 2 alleged Mr. Thompson unlawfully threatened to use a drawn deadly weapon on another person—a firearm and vehicle, respectively—in violation of Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2021). Count 3 alleged he attempted to cause bodily injury to another person with a deadly weapon—a vehicle—in violation of Wyo. Stat. Ann. § 6-2-502(a)(ii). The jury found Mr. Thompson guilty of Counts 1 and 2 but not guilty of Count 3. The district court sentenced him to 6-8 years in prison but suspended the sentence in favor of five years of supervised probation. Mr. Thompson appealed.

[¶8]   We will provide additional facts as necessary in our discussion of the issue.

## DISCUSSION

### *Background*

[¶9]   At trial, Ms. Booth-Thompson testified to the above facts concerning Mr. Thompson's actions. The State then called Officer Casey Gallinger of the Mills Police Department as a witness. Officer Gallinger told the jury that when he arrived on scene, he observed Mr. Thompson in the Jeep and Ms. Booth-Thompson trying to walk away from the Jeep. He testified he spoke with Ms. Booth-Thompson at the scene. When the State asked Officer Gallinger if he recalled what Ms. Booth-Thompson told him, defense counsel objected on hearsay grounds. The district court asked the State the purpose of the testimony. It responded, "I believe that this [testimony] would essentially confirm what she had stated." The court asked, "So you're offering it as a prior consistent statement?" The State replied, "Yes." Defense counsel continued to object, stating Ms. Booth-Thompson had not been impeached. The court overruled the objection but not for the reason offered by the State. Instead, it stated: "I'll allow him to testify to this as it relates to his investigation and what he did." Officer Gallinger proceeded to tell the jury he talked with Ms. Booth-Thompson to figure out "what was going on" so he could relay the information to the Natrona County Sheriff's deputies. When asked what Ms. Booth-Thompson told him, Officer Gallinger responded:

2

> She . . . stated she was trying to -- she just wanted to leave. She stated that Mr. Thompson attempted to run her over with the vehicle and also pointed a gun at her, firing one round.

He testified he searched the Jeep and found a loaded handgun between the passenger seat and the center console.

[¶10]   Later, the State called Sergeant Sean Ellis from the Natrona County Sheriff's Office, who was assigned to investigate the case. It asked Sergeant Ellis whether he had spoken to Ms. Booth-Thompson; he said he interviewed her at the Sheriff's Office shortly after the incident. The State asked him if he could tell the jury "what [he] learned during [his] interview with Ms. Thompson?" Before he could answer, defense counsel objected on hearsay grounds. The State responded it was not hearsay but rather "prior consistent statements and part of his investigation." The court overruled Mr. Thompson's objection, explaining (outside the hearing of the jury):

> Well, officers can testify as to their conversations with people, not for the truth of the matter asserted but to show what they did in their investigation, and that's the question that I believe is pending or the question that was asked about. The State is trying to get him to explain what he did in his investigation, so I'll allow it not for the truth of the matter asserted but for what the officer was doing in his investigation.

Defense counsel responded, "Very good."

[¶11]  The State proceeded to ask Sergeant Ellis a series of questions concerning the information he obtained from his interview with Ms. Booth-Thompson:

> Q. . . . Sergeant Ellis, can you tell us what you learned during your interview with [Ms. Booth-Thompson]?
>
> A. [She] informed me that on [June 29], she went to Boulder, Colorado, and attended a bridal shower for her niece, returning to Casper, Wyoming, and ultimately her house . . . in the evening hours of June 30th.
>
> Q. Did she tell you what happened when she got home from Boulder?
>
> A.     She told me upon arriving home, she got into a disagreement with Mr. Thompson, and he accused her of having an affair.

3

Q. And what did she do after that?

A. After . . . being accused of having the affair, she departed the house. She left her house.

Q. And . . . did she tell you whether she left on foot or whether she was driving?

A. She told me that she grabbed her prescription medications and left on foot.

Q. And after that, what did she tell you?

A. She told me that she left her property onto Doane Lane and headed towards Salt Creek Highway, which is basically in an easterly direction.

Q. And did Ms. Thompson tell you anything about being followed by the defendant and how he was driving?

A. She told me that she overheard the Jeep coming up behind her and that at one point, Mr. Thompson, driving the Jeep, struck her left shoulder, and then in another instant after the left shoulder, she almost had her right ankle run over by Mr. Thompson.

Q. During the time of all this happening, did [Ms. Booth-Thompson] tell you anything else as to what the defendant did?

A. As she was walking east in the area, she said that at one point, he demanded that she get back into the Jeep. She denied. She overheard Mr. Thompson make a statement to her 'I'll put a couple of rounds in you.' . . . After hearing that, she saw a gun displayed and pointed at her by Mr. Thompson, and she turned and started walking [away again] in a westward – or east direction and she heard a gunshot.

Q. Did she state whether or not she saw where the gun was fired?

A. She did not know in what direction the bullet left the gun as she had her back turned to Mr. Thompson walking away.

4

Q. And why did she tell you that she kept walking?

A. She was scared. She said she didn't want to get in the Jeep.

[¶12]   At this point, defense counsel again objected because the testimony "[was] beyond the scope of her testimony, and [was] now getting into witness impact stuff."  The State disagreed, stating Ms. Booth-Thompson "did testify to what she had told investigators and why . . . she had kept walking, so I don't believe that this is hearsay."  The court sustained the objection.  It reasoned:

> I don't think [this testimony] is going to what the officer did in relation to the investigation.  If he did something as a result of that, you may ask him those questions; but him simply repeating what she may or may not have said is improper at this time. . . .

[¶13]   Later, defense counsel asked the court to give a limiting instruction "to inform the jury that both what he [Sergeant Ellis] and [Officer Gallinger] said about Ms. Thompson's statements were not direct evidence of what happened, that it's her testimony they need to rely on."  He requested the instruction be given at the conclusion of Sergeant Ellis's testimony.  The court directed defense counsel to draft a proposed instruction for its review.  Counsel did so and the court provided it to the jury at the conclusion of Sergeant Ellis's testimony.  The limiting instruction read:

> Ladies and gentlemen, yesterday, I allowed Sergeant Ellis to repeat statements that were made by Ms. Booth-Thompson; and I want to read you an instruction before Mr. Ellis gets off the stand here.  You are instructed that the officers who repeated Ms. Booth-Thompson's statements were simply explaining what they knew at the time so you might understand their subsequent actions.  You are not to consider such statements as evidence of what actually happened.  You must rely on Ms. Booth-Thompson's testimony.

### The Parties' Arguments

[¶14]  Mr. Thompson argues the trial court abused its discretion in allowing Officer Gallinger and Sergeant Ellis to testify to what Ms. Booth-Thompson told them because it was hearsay and neither the ground offered by the court (to explain the officers' investigation) nor that offered by the State at trial (prior consistent statements) rendered the testimony admissible.  The State claims the subject testimony was not hearsay because it was not offered to prove the truth of the matter asserted but rather to explain the effect

5

Ms. Booth-Thompson's statements had on the officers and why they acted as they did in their investigation. Even assuming the district court abused its discretion in allowing the subject testimony, the State argues the error was not prejudicial.

### *Standard of Review*

[¶15] "We review a district court's ruling on the admissibility of evidence, including hearsay, for an abuse of discretion." *Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 58, 479 P.3d 1222, 1239 (Wyo. 2021). *See also, Toth v. State*, 2015 WY 86A, ¶ 29, 353 P.3d 696, 705 (Wyo. 2015) ("'We review claimed error concerning the improper admission of evidence for abuse of discretion and will not reverse the trial court's decision absent a clear abuse.'" (quoting *Szymanski v. State*, 2007 WY 139, ¶ 15, 166 P.3d 879, 883 (Wyo. 2007))). "A district court 'abuses its discretion when it could not have reasonably concluded as it did.'" *Majors v. State*, 2011 WY 63, ¶ 11, 252 P.3d 435, 439 (Wyo. 2011) (quoting *Thomas v. State*, 2006 WY 34, ¶ 10, 131 P.3d 348, 352 (Wyo. 2006), and citing *Gunnett v. State*, 2005 WY 8, ¶ 15, 104 P.3d 775, 779 (Wyo. 2005)). "If we find the evidence was admitted in error, then we consider whether the error was prejudicial." *Mitchell v. State*, 2020 WY 142, ¶ 17, 476 P.3d 224, 231 (Wyo. 2020) (citing *Dixon v. State*, 2019 WY 37, ¶ 40, 438 P.3d 216, 231 (Wyo. 2019)).

### *W.R.E. 801(d)(1)(B)*

[¶16] We first examine whether the officers' testimony was admissible on the ground offered by the State at trial—prior consistent statements under Wyoming Rule of Evidence (W.R.E.) 801(d)(1)(B). Our discussion will be brief, however, because the district court implicitly rejected W.R.E. 801(d)(1)(B) as a basis for admission by admitting the testimony on another ground. Moreover, the State does not defend the testimony's admissibility under Rule 801(d)(1)(B) on appeal.

[¶17] W.R.E. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[1] Under W.R.E. 802, hearsay is generally not admissible. "However, Rule 801(d)(1)(B) provides that, under certain circumstances, prior consistent statements are not hearsay." *Hicks v. State*, 2021 WY 2, ¶ 12, 478 P.3d 652, 657 (Wyo. 2021). Rule 801(d)(1)(B) states:

---

[1] Some of the State's comments at trial indicate it believed the officers' testimony about what Ms. Booth-Thompson told them was not hearsay because she had already testified to the same effect. The State was mistaken. The subject testimony was inadmissible hearsay – it constituted "statement[s], other than [those] made by the declarant [Ms. Booth-Thompson] while testifying at the trial or hearing[.]" Rule 801(c). *See also,* Rule 801(a) (defining "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion"); Rule 801(b) (defining "declarant" as "a person who makes a statement"). And, as we will explain, the subject testimony was offered "to prove the truth of the matter asserted." Rule 801(c).

6

(d) *Statements which are not hearsay.* – A statement is not hearsay if:

(1) Prior Statement by Witness. – The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]

[¶18] "Four requirements must be satisfied for admission of a prior consistent statement under W.R.E. 801(d)(1)(B): (1) the declarant must testify at trial; (2) the declarant must be subject to cross-examination concerning the prior statement; (3) the prior statement must be consistent with the declarant's trial testimony; and (4) the prior statement must be offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Hicks*, ¶ 13, 478 P.3d at 657 (citing *Griggs v. State*, 2016 WY 16, ¶ 98, 367 P.3d 1108, 1136 (Wyo. 2016), and *Large v. State*, 2008 WY 22, ¶ 37, 177 P.3d 807, 818-19 (Wyo. 2008)). Mr. Thompson concedes the first three requirements were met. He argues, however, the fourth requirement was not.

[¶19] Under the fourth requirement, "prior consistent statements of a witness are allowed only to rehabilitate a witness after his credibility has been impeached and only when that credibility has been impeached in a manner described in the rule, i.e., by an express or implied charge against the witness of recent fabrication or improper influence or motive." *Winters v. State*, 2019 WY 76, ¶ 37, 446 P.3d 191, 205 (Wyo. 2019) (citing *Jones v. State*, 2019 WY 45, ¶¶ 23-25, 439 P.3d 753, 760-61 (Wyo. 2019) ("[P]rior consistent statements offered in anticipation of an attack described in the rule should not be admitted.")). The fourth requirement is not met simply because the defendant claimed "'what the victim said happened did not happen.'" *Id.* (quoting *Jones*, ¶ 24, 439 P.3d at 761). "However, '[t]he charge of fabrication or improper motive need not come only as a specific allegation during cross-examination; . . . it may be made by implication or innuendo, and it may be found in the thrust of the defenses and testimony presented.'" *Id.* (quoting *Lancaster v. State*, 2002 WY 45, ¶ 18, 43 P.3d 80, 89 (Wyo. 2002), *overruled on other grounds by Jones*, ¶ 25, 439 P.3d at 761-62).

[¶20] Mr. Thompson did not impeach Ms. Booth-Thompson's credibility in a manner described by Rule 801(d)(1)(B) prior to Officer Gallinger's and Sergeant Ellis's testimony. In his brief opening statement, defense counsel admitted Mr. Thompson "pick[ed] a fight" with Ms. Booth-Thompson, followed her down the road, "tried to get her to get in the [Jeep]," and shot "the gun behind her back." He argued, however, he did not intend to harm her with the Jeep or the gun but was just "trying to get her attention." This argument

7

did not expressly or impliedly charge Ms. Booth-Thompson with recently fabricating her story or acting under an improper influence or motive. Similarly, during cross-examination of Ms. Booth-Thompson, defense counsel merely clarified her version of the events and where on the road they occurred. He did not suggest she had recently concocted her story or was being improperly influenced or motivated.

[¶21] The officers' testimony repeating Ms. Booth-Thompson's out-of-court statements was not admissible under Rule 801(d)(1)(B). The district court may have recognized this because it did not admit the testimony under this rule, as the State requested, but rather found its own reason to permit the testimony. It allowed the testimony to provide context to the officers' investigation. We now consider whether the testimony was admissible on that basis.[2]

### *To Explain the Investigation/Effect on Hearer*

[¶22] "[A] prosecutor may properly use out-of-court statements to show their effect on the hearer, to explain why the hearer did what he did or why a conversation took a particular turn. The hearsay rule does not prohibit using the statements in that manner because it does not relate to proving the truth of those statements." *Craft v. State*, 2012 WY 166, ¶ 24, 291 P.3d 306, 312 (Wyo. 2012) (citations omitted). *See also, Proffit v. State*, 2008 WY 102, ¶ 21, 191 P.3d 963, 970 (Wyo. 2008) ("[Declarant's] statements to [State witness] Martinez would only be hearsay if they were being offered to prove the assertions being made by [the declarant]. . . . The statements were not, however, offered for that purpose. Rather, they were offered for the purpose of showing the effect the statements had upon Martinez and the appellant."). Testimony of an investigating law enforcement officer repeating a report of a defendant's criminal behavior may fall within the "effect on the hearer" rule. *Griggs*, ¶ 85, 367 P.3d at 1133. As we explained in *Griggs*:

> [a]n out-of-court declaration by a third party to a police officer which is offered at trial merely to explain the officer's conduct in the investigation of a crime is usually admissible because it is not offered for the truth of the matter stated. The conduct to be explained should be relevant, in need of explanation, and contemporaneous with the statements.

*Id.* (quoting 29 Am. Jur. 2d *Evidence* § 676 (2015)) (other citations omitted). Stated differently, "[o]ut of court statements are not hearsay when offered for the limited purpose of explaining why a[n] investigation was undertaken" because "[a]n arresting or investigating officer should not be put in the false position of seeming just to have

---

[2] To the extent Mr. Thompson argues it was improper for the district court to admit the officers' testimony for a reason different than that offered by the State, the proponent of the evidence, we need not address his argument because we conclude the court abused its discretion in admitting the subject testimony, under the State's reason and its own.

happened upon the scene; he should be allowed some explanation of his presence and conduct." *Id.*, ¶ 86, 367 P.3d at 1133-34 (quoting *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987), and *United States v. Cass*, 127 F.3d 1218, 1223 (10th Cir. 1997)).

[¶23]   That being said, the use of out-of-court statements to show their effect on the hearer is limited. *Id.*, ¶ 86, 367 P.3d at 1134.   While "[i]t may be necessary and appropriate to introduce some [out-of-court] statements or portions of statements to explain the course of events, . . . other portions of the same statements may go far beyond what is necessary for this limited purpose.   The rationale may not be used to inform the jury of the details of a victim's allegation of the criminal conduct or a witness's statement *when those details are not necessary to explain what happened next*." *Id.*, ¶ 86, 367 P.3d at 1134 (emphasis added).   As a leading treatise explains:

> One area where abuse may be a particular problem involves statements by arresting or investigating officers regarding the reason for their presence at the scene of a crime. The officers should not be put in the misleading position of appearing to have happened upon the scene and therefore should be entitled to provide some explanation for their presence and conduct. They should not, however, be allowed to relate historical aspects of the case, such as complaints and reports of others containing inadmissible hearsay. Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted. The need for this evidence is slight, and the likelihood of misuse great.   Instead, a statement that an officer acted "upon information received," or words to that effect, should be sufficient.

2 McCormick on Evidence § 249 (8th ed. 2020) (footnotes omitted).   *See also, Overson v. State*, 2017 WY 4, ¶ 34, 386 P.3d 1149, 1156 (Wyo. 2017) (the need for evidence offered to indicate why an officer acted as he did "is slight, and its use should be limited to explaining what happened next").   "[T]he dispositive question in cases involving this type of evidence is whether it was truly offered as background information or to prove the truth of the matter asserted." *Griggs*, ¶ 89, 367 P.3d at 1134.

[¶24]   In this case, after Officer Gallinger told the jury he had spoken with Ms. Booth-Thompson at the scene, the State asked him if he "recall[ed] what she stated."   Defense counsel objected and the district court overruled the objection because "it relates to his investigation and what he did."   Nothing from the question, however, indicated the State was seeking testimony from the officer as to what he did next. Rather, the question simply asked him if he remembered what Ms. Booth-Thompson told him.   Once the district court overruled the objection, the State did not again ask Officer Gallinger if he recalled what

Ms. Booth-Thompson told him; rather, it proceeded to ask Officer Gallinger what she told him. Similarly, the State asked Sergeant Ellis if he could "tell us what [he] learned during [his] interview with Ms. Thompson[.]" Mr. Thompson objected on hearsay grounds. The court overruled the objection, interpreting the question as the State "trying to get him to explain what he did in his investigation." At that point, defense counsel responded, "Very good." It is unclear whether defense counsel's response meant he agreed with the court's ruling or rather he disagreed with it but would nevertheless comply with it. In any event, the State's question did not seek an explanation for what Sergeant Ellis did next in his investigation. Rather, it asked him to tell the jury what Ms. Booth-Thompson told him. Sure enough, the State's next nine questions to Sergeant Ellis elicited what Ms. Booth-Thompson told him. Although none of these questions asked Sergeant Ellis to explain what he did next, Mr. Thompson did not object to any of them. It was not until the State asked, and Sergeant Ellis answered, what Ms. Booth-Thompson told him with respect to her reason for continuing to walk that Mr. Thompson objected.

[¶25] Officer Gallinger's and Sergeant Ellis's testimony concerning Ms. Booth-Thompson's statements to them was very detailed. None of those details were necessary to explain their investigation. Officer Gallinger could have simply told the jury that based on what Ms. Booth-Thompson told him, he searched the Jeep and found the gun. Likewise, Sergeant Ellis could have said he interviewed Ms. Booth-Thompson and based on what she said, he took various steps in his investigation. Even the State admits in its brief that Sergeant Ellis's testimony began to "exceed what is permissible under the effect on the [hear]er hearsay exception." (State's Br., p. 16). Both Officer Gallinger's and Sergeant Ellis's testimony went far beyond describing the effect Ms. Booth-Thompson's statements had on them and sought to prove the truth of those statements, i.e., that Mr. Thompson unlawfully threatened to use a vehicle and firearm by hitting Ms. Booth-Thompson's shoulder with the Jeep, attempting to run her over, threatening to put a couple of rounds in her, pointing the gun at her, and firing it.

[¶26] Our decision in *Griggs* is instructive. The child victims told their foster mother they had been sexually abused by the defendant. *Griggs*, ¶ 5, 367 P.3d at 1118. At trial, the foster mother gave detailed accounts of the children's statements to her. *Id.*, ¶ 82, 367 P.3d at 1133. Although the defendant did not object to the testimony at trial, he argued on appeal the foster mother's testimony was inadmissible hearsay. *Id.*, ¶¶ 79, 82, 367 P.3d at 1132-33. The State claimed the testimony was admissible because it was not admitted for the truth of the matter asserted but rather to show what the foster mother did in response to the reports, i.e., the effect on the hearer. *Id.*, ¶ 83, 367 P.3d at 1133. We rejected the State's argument, explaining:

> The record in this case clearly establishes the State presented [the foster mother]'s testimony about the children's statements to prove the truth of the matter asserted, i.e., that the abuse occurred. [The foster mother]'s testimony about the

10

children's reports of abuse was very detailed, including the children's statements about the specific sexual acts and identification of "Byron" [(the defendant)] as the perpetrator. None of those details were necessary to explain what [the foster mother] or others did next. The State inquired about them to prove the truth of the allegations.

*Id.*, ¶ 92, 367 P.3d at 1108. The same is true here. The State's questions to the officers were not in any manner directed to having them explain "what they did next" and the officers' detailed answers concerning Ms. Booth-Thompson's statements were not needed to explain their subsequent actions. The State provided no foundation for the district court's *sua sponte* conclusion that the questions were being asked to explain what the officers did. The State asked the officers to repeat Ms. Booth-Thompson's statements to prove their truth, making them inadmissible hearsay.

[¶27] The district court abused its discretion in allowing the officers to testify to Ms. Booth-Thompson's out-of-court statements to explain their investigation.

### *Prejudice*

[¶28] "'Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made.' . . . . 'Prejudicial error requires reversal, while harmless error does not.'" *Vinson v. State*, 2020 WY 93, ¶ 24, 467 P.3d 1009, 1014 (Wyo. 2020) (quoting *Broberg v. State*, 2018 WY 113, ¶ 19, 428 P.3d 167, 172 (Wyo. 2018)).

[¶29] The erroneous admission of hearsay "is not harmful if the evidence was 'merely cumulative' of other evidence showing the defendant's guilt." *Griggs*, ¶ 124, 367 P.3d at 1142 (quoting *Lancaster v. State*, 2002 WY 45, ¶ 29, 43 P.3d 80, 93 (Wyo. 2002)). *See also, Brown v. State*, 2019 WY 102, ¶ 23, 450 P.3d 208, 213 (Wyo. 2019) ("[W]e conclude that the admission of alleged hearsay was not harmful because the record makes clear that any such evidence was 'merely cumulative' of other evidence showing Mr. Brown's guilt, including [the victim's] personal account of the assault.") (citation omitted); *Callen v. State*, 2008 WY 107, ¶ 11, 192 P.3d 137, 143 (Wyo. 2008) (because the hearsay testimony was entirely cumulative of the declarant's earlier testimony, its admission was harmless).

[¶30] Officer Gallinger's and Sergeant Ellis's hearsay testimony was cumulative of the other compelling evidence of Mr. Thompson's guilt. *Broberg*, ¶ 20, 428 P.3d at 172 (deciding defendant was not prejudiced by the erroneous admission of testimony because, *inter alia*, other evidence introduced at trial provided compelling evidence of [defendant]'s guilt). Ms. Booth-Thompson testified to the same information she provided to Officer Gallinger at the scene and to Sergeant Ellis in her interview. The eyewitnesses' 911 call, which was admitted without objection, was largely consistent with Ms. Booth-Thompson's

11

testimony and described Mr. Thompson's actions in trying to run Ms. Booth-Thompson over with the Jeep and firing the gun. Mr. Thompson admitted to the jury he accused Ms. Booth-Thompson of having an affair, called her names, and followed her down the road in the Jeep, driving beside her. While he did not recall the Jeep's mirror hitting her left arm, he believed the front bumper tapped her hand. He also conceded he had lied to Sergeant Ellis and he had, in fact, fired the gun.

[¶31] Per Mr. Thompson's request, the district court provided a limiting instruction. "A limiting instruction is one factor we consider in determining whether there is a reasonable probability that the verdict would have been different if the erroneous evidence had not been admitted at trial." *Swett v. State*, 2018 WY 144, ¶ 53, 431 P.3d 1135, 1148 (Wyo. 2018) (citing *Doherty v. State*, 2006 WY 39, ¶¶ 26-28, 131 P.3d 963, 971-72 (Wyo. 2006)). The limiting instruction given in this case was not without problems. It did not specifically mention Officer Gallinger even though defense counsel intended it to. It was not given contemporaneous with the challenged testimony but rather at the conclusion of Sergeant Ellis's testimony. *People v. Murphy*, 2021 CO 22, ¶ 39, 484 P.3d 678, 686 (Colo. 2021) (suggesting the "better practice" is to provide a contemporaneous limiting instruction if one is requested); *Bolinger v. State*, No. 14-18-00931-CR, 2021 WL 282606, at *7 (Tex. App. Jan. 28, 2021) (unpublished) ("A contemporaneous limiting instruction prevents the jury from contemplating evidence in an inappropriate manner . . . . Even when a limiting instruction is given to the jury in the jury charge, as it was in this case, this is less effective than requesting a simultaneous limiting instruction immediately after the evidence is admitted.") (citation omitted). And the instruction improperly told the jury it "must rely" on Ms. Booth-Thompson's testimony for what occurred rather than allow the jury to assess her credibility and the weight to be given her testimony. *See Fairbourn v. State*, 2020 WY 73, ¶ 85, 465 P.3d 413, 432 (Wyo. 2020) ("'It is the province of the jury to weigh the credibility of the witnesses.'" (quoting *Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 636 (Wyo. 2002))); *Nielsen v. State*, 2018 WY 132, ¶ 37, 430 P.3d 740, 752 (Wyo. 2018 ("Credibility determinations are exclusively the province of the jury[.]"). Mr. Thompson invited these errors, however, because he drafted the instruction and requested it be given at the close of Sergeant Ellis's testimony. *Jackson v. State*, 2019 WY 81, ¶ 9, 445 P.3d 983, 986 (Wyo. 2019) ("'The doctrine of invited error prohibits a party from raising on appeal alleged trial court errors that were induced by that party's actions.'" (quoting *Toth*, ¶ 45, 353 P.3d at 710)). Nonetheless, the instruction was correct in one crucial respect—it told the jury it was not to consider the officers' testimony concerning Ms. Booth-Thompson's out-of-court statements "as evidence of what actually happened." *See Griggs*, ¶ 91, 367 P.3d at 1135 ("A limiting instruction is an effective way to ensure the jury only considers the evidence for the appropriate reason and not for the truth of the matter asserted. 30B Fed. Prac. & Proc. Evid. § 7005."). *See also,* W.R.E. 105 ("When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."). We presume the jury followed this part of the instruction and did not consider the subject testimony for its truth,

thereby reducing any prejudicial effect. *Solis v. State*, 2013 WY 152, ¶ 49, 315 P.3d 622, 633 (Wyo. 2013) ("Jurors are presumed to follow the court's instructions." (citing *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000))).

[¶32] Finally, the error in admitting the officers' hearsay testimony was brief and isolated. *See Broberg*, ¶ 20, 428 P.3d at 172 (concluding defendant was not prejudiced by the erroneous admission of testimony because, among other things, the testimony was brief and isolated). The State did not rely on Ms. Booth-Thompson's out-of-court statements in closing argument or otherwise seek to bolster her credibility with them. *Id*. *See also, Vinson*, ¶ 29, 467 P.3d at 1015 (concluding defendant was not prejudiced by the admission of evidence that he had sexual intercourse with the victim twice without her consent on the night of the aggravated assault and battery because, *inter alia*, "neither the prosecutor nor defense counsel mentioned the sexual intercourse evidence during closing argument" and the evidence was outweighed by the "compelling evidence of Mr. Vinson's guilt").

[¶33] There is no reasonable probability the verdict would have been more favorable to Mr. Thompson had the improper hearsay evidence not been admitted.

## CONCLUSION

[¶34] Although the district court abused its discretion in allowing hearsay testimony from the officers, the error was not prejudicial.

[¶35] We affirm Mr. Thompson's convictions.

13